UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHNIELLE DWYER, ERICA LATON, on behalf of herself and as parent and guardian of her minor children, E.L. and S.S., MARIA KRANTZ, on behalf of herself and as parent and guardian of her minor child, F.K., BRITTANY MANSI, on behalf of herself and as parent and guardian of her minor child, J.M., KRISTIN LOGAN, on behalf of herself and as parent and guardian of her minor child, J.L., MARY HALL, on behalf of herself and as parent and guardian of her minor child D.B., RACHEAL PARADISO, on behalf of herself and as parent and guardian of her minor children, R.H., A.H., and Z.H., and CHRISTOPHER ANDREWS, and on behalf of all others similarly situated, | Case No. <br><br> CLASS ACTION COMPLAINT <br><br> DEMAND FOR JURY TRIAL <br><br> April 28, 2025 |
| *Plaintiffs*, <br> v. <br><br> POWERSCHOOL HOLDINGS, INC., <br><br> *Defendant.* | |

Plaintiffs, on behalf of themselves and as parents and guardians of their minor children; ("Plaintiffs"), by and through their attorneys, bring this class action complaint under Federal Rule of Civil Procedures 23(b)(2), 23(b)(3), and 23(c)(4) against PowerSchool Holdings, Inc., ("PowerSchool" or "Defendant") and make the following allegations based upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters, as follows.

## I. INTRODUCTION

Plaintiffs bring this class action against PowerSchool for its failure to properly secure and safeguard personally identifiable information ("PII" or "Private Information") including, but not limited to, Plaintiffs' and Class Members' names, contact information, dates of birth, medical information, Social Security numbers, grade information, and other related information.

1.     PowerSchool is an EdTech platform deeply entrenched in schools and school districts across the United States.

2.     PowerSchool collects, stores, and analyzes the sensitive data of teachers and students it acquires through its educational technology products that it sells to schools and school districts. The information PowerSchool takes from students includes everything from educational records and behavioral history to health data and information about a child's family circumstances. PowerSchool collects this highly sensitive information under the guise of educational support, but in fact collects it for its own commercial gain.

3.     PowerSchool has built a billion-dollar corporation by collecting and exploiting the information of children in compulsory education environments and then failed to adequately safeguard this Private Information.

4.     According to the notification the Plaintiffs' children's and employer's school districts sent, hackers used a compromised credential to access PowerSchool's student information.

5.     This Data Breach impacted minor children, their families, and teachers whose data was kept by PowerSchool and involved at least the following types of information: "individual's name, contact information, date of birth, limited medical alert information, Social Security Number (SSN), and other related information."

2

6.     During their business operations, PowerSchool acquired, collected, utilized, and derived a benefit from Plaintiffs' and Class Members' Private Information. Therefore, PowerSchool owed and otherwise assumed statutory, regulatory, contractual, and common law duties and obligations, including keeping Plaintiffs' and Class Members' Private Information confidential, safe, secure, and protected from the type of unauthorized access, disclosure, and theft that occurred in the Data Breach described below.

7.     Despite its duties to Plaintiffs and Class Members related to and arising from its collecting and maintaining of Plaintiffs' and Class Members' Private Information, its computer systems and networks were negligently and/or recklessly maintained. As a result of the breach, unauthorized third-party hackers gained access to and obtained Plaintiffs' and Class Members' PII.

8.     Plaintiffs bring this class action lawsuit on behalf of themselves, their minor children, and those similarly situated to address PowerSchool's inadequate safeguarding of Class Members' Private Information that it collected and maintained.

9.     Upon information and belief, PowerSchool maintained the Private Information of an estimated 60 million individuals in a negligent manner on its computer systems and network, which resulted in the theft of Plaintiffs' and putative Class Members' PII.

10.     Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to PowerSchool because other EdTech companies had previously been subjected to criminal hacking, and thus PowerSchool was on notice that failing to take appropriate protective measures would expose and increase the risk that the Private Information could be compromised and stolen.

11.     While many details of the Data Breach remain in the exclusive control of Defendant PowerSchool, it is clear that Defendant PowerSchool breached their duties and obligations by failing in one or more of the following ways: (i) failing to design, test, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (ii) failing to design, implement, and maintain reasonable data retention policies; (iii) failing to adequately train staff on data security; (iv) failing to comply with industry-standard data security practices; (v) failing to warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (vi) failing to encrypt or adequately encrypt the Private Information; and (vii) otherwise failing to secure the software and hardware using reasonable and effective data security procedures.

12.     Hackers routinely offer unencrypted and unredacted Private Information for sale to criminals. The exposed Private Information of Plaintiffs and Class Members most likely will be sold repeatedly on the dark web.

13.     As a result of Defendant's unreasonable and inadequate data security practices that resulted in the Data Breach, Plaintiffs and Class Members now face a current and ongoing risk of identity theft, which is heightened here by the loss of Social Security numbers, which are extremely valuable to identity thieves.

14.     In addition to Plaintiffs' and Class Member's current and ongoing risk of identity theft, they have suffered numerous actual and concrete injuries and damages, including: (i) invasion of privacy; (ii) financial "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iv) financial "out-of-pocket" costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity

4

theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) diminution of value of their Private Information; (viii) anxiety, annoyance, and nuisance; and (ix) the continued risk to their Private Information, which remains in the control of Defendant PowerSchool, and which is subject to further breaches, as long as Defendant PowerSchool fails to undertake appropriate and adequate measures to protect Private Information of Plaintiffs and Class Members.

15.     Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach. Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, future costs of identity theft monitoring, injunctive relief including improvements to PowerSchool's data security systems, and future annual audits.

16.     Accordingly, Plaintiffs bring this action against PowerSchool seeking redress for its unlawful conduct.

## II. JURISDICTION AND VENUE

17.     This Court has original jurisdiction over the action under the Class Action Fairness Act ("CAFA") of 2005. Under 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interests and costs, and at least one member of the proposed Class is a citizen of a different state than Defendant PowerSchool.

18.     This Court has personal jurisdiction over Defendant because PowerSchool purposely availed itself of the laws of Connecticut and has engaged and is engaging in business conduct throughout the State.

19.     Venue is proper in this District under 28 U.S.C. § 1391 because PowerSchool is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the conduct giving rise to this complaint took place within this District.

### III. THE PARTIES

20.     Plaintiff Johnielle Dwyer is a teacher employed by a school district in Connecticut. At all relevant times she has been domiciled in the state of Connecticut. In January 2025, Plaintiff Johnielle Dwyer received a notification from her employer school district in Connecticut informing her that her personal information was exposed as part of the PowerSchool data breach.

21.     Plaintiff Erica Laton is the mother and legal guardian of minor Plaintiffs E.L. and S.S. At all relevant times, she, E.L., and S.S. have been domiciled in the state of Connecticut. In January 2025, Plaintiff Erica Laton received a notification from her children's school district informing her that her children's personal information was exposed as part of the PowerSchool data breach.

22.     Plaintiff Maria Krantz is the mother and legal guardian of Plaintiff F.K.  At all relevant times, she and F.K. have been domiciled in the state of Connecticut. In January 2025, Plaintiff Maria Krantz received a notification from her child's school district informing her that her child's personal information was exposed as part of the PowerSchool data breach.

23.     Plaintiff Brittany Mansi is the mother and legal guardian of Plaintiff J.M.  At all relevant times, she and J.M. have been domiciled in the state of Connecticut. In January 2025, Plaintiff Brittany Mansi received a notification from her child's school district informing her that her child's personal information was exposed as part of the PowerSchool data breach.

24.    Plaintiff Kristin Logan is the mother and legal guardian of Plaintiff J.L.  At all relevant times, she and J.L. have been domiciled in the state of Connecticut. In January 2025, Plaintiff Kristin Logan received a notification from her child's school district informing her that her child's personal information was exposed as part of the PowerSchool data breach.

25.    Plaintiff Mary Hall is the mother and legal guardian of Plaintiff D.B.  At all relevant times, she and D.B. have been domiciled in the state of Connecticut. In January 2025, Plaintiff Mary Hall received a notification from her child's school district informing her that her child's personal information was exposed as part of the PowerSchool data breach.

26.    Plaintiff Racheal Paradiso is the mother and legal guardian of Plaintiffs R.H., A.H., and Z.H.  At all relevant times, she, R.H., A.H., and Z.H. have been domiciled in the state of Connecticut. In January 2025, Plaintiff Racheal Paradiso received a notification from her children's school district informing her that her children's personal information was exposed as part of the PowerSchool data breach.

27.    Plaintiff Christopher Andrews is a teacher employed by a school district in Connecticut. At all relevant times, he has been domiciled in the state of Connecticut. In January 2025, Plaintiff Chrstopher Andrews received a notification from his employer school district in Connecticut informing him that his personal information was exposed as part of the PowerSchool data breach.

28.    Defendant PowerSchool is Delaware corporation with a principal place of business located at 150 Parkshore Drive, Folsom, California 95630.

7

## IV. FACTUAL ALLEGATIONS

**A.      PowerSchool Collects, Monetizes, and Stores the Data of Millions of School-Age Children and their Parents.**

29.      PowerSchool is an EdTech platform which specializes in data collection, storage, and analytics. It went public in 2021 and shortly thereafter was valued at nearly $7 billion.

30.      Most PowerSchool's customers are schools and school districts where it gains virtually unrestricted access to the data of the children who attend those schools and their parents by persuading those customers to implement its products.

31.      As a result, millions of school-age children use PowerSchool products. PowerSchool claims to reach 35 million school-age children, which represents about 75 percent of the students in North America.

**B.      PowerSchool's Data Practices Pose Risks to Children by Compromising the Security of their Personal Data.**

32.      PowerSchool put Personal information at risk by collecting vast amounts of data from both students and their families.

33.      Schools and school districts have been particularly and increasingly targeted by cybercriminals in recent years, which has resulted in leaks of highly personal and sensitive information about children, some of which perpetrators have made publicly available.

34.      Such exposure has both immediate and long-term consequences for children. As explained by one cybersecurity professional whose son's school was hacked, "It's your future. It's getting into college, getting a job. It's everything."

35.      PowerSchool's data practices unduly compromise the security information it collects from children and parents, and the resulting harms and risks of harms are exacerbated by

the sheer volume of data collected and the number of entities that receive access to it. Once such data is unlawfully obtained, the harms are extraordinarily difficult to address.

## C.     The PowerSchool Data Breach

36.     On December 22, 2024, cybercriminals successfully accessed PowerSchool's computer systems and exfiltrated PII of minor students, their parents, teachers, and school administrators. PowerSchool only became aware of this breach *six* days later when the cybercriminals demanded a ransom.

37.     According to PowerSchool's General FAQ, the hack occurred through one of PowerSchool's "community-focused customer portals, PowerSource," which allowed "further access to the company's school information system, PowerSchool SIS."

38.     PowerSchool SIS ("P-SIS") is the information system schools use to manage items such as student records, grades, attendance, and enrollment.

39.     PowerSchool describes it as the "mission-critical data backbone that powers K-12 operations" and "serves as the hub and single source of truth for student data." PSIS is scalable and "covers all district and school administration needs, including registration, attendance, scheduling, federal and state compliance reporting, data management, faculty management, emergency/medical and health management."

40.     PowerSchool then investigated the Data Breach and confirmed the breach affected "families and educators."

41.     Thereafter, on January 8, 2025, PowerSchool publicly announced the Data Breach and began notifying its customers.

42.     PowerSchool noted the PII exfiltrated "may have included one or more of the following: the individual's name, contact information, date of birth, limited medical alert information, Social Security Number (SSN), and other related information."

**D.     The Data Breach Was Foreseeable**

43.     At all relevant times, PowerSchool knew, or reasonably should have known, of the importance of securing and safeguarding the PII of Plaintiffs and Class Members and the foreseeable consequences that would occur if PowerSchool's data was breached, including the significant costs that would be imposed on Plaintiffs and Class Members as a result.

44.     PowerSchool was, or should have been, fully aware of the unique type and the significant volume of data on their network, which contained detailed personal information of millions of students and families and, therefore, the significant number of individuals who would be harmed by the exposure of the data.

45.     The Federal Bureau of Investigation recognizes that "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."

46.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the time period before the date of the breach.

47.     In 2022, 1,774 data breaches occurred, affecting approximately 392,000,000 victims.

48.     Cyberattacks have become ubiquitous, so much so that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and therefore can prepare for, a potential attack.

49.     Therefore, the increase in such attacks, and the attendant risk of future attacks, were, or reasonably should have been, widely known to the public and to PowerSchool.

50.     PowerSchool's knowledge of the risk of a data breach is evident in the fact that PowerSchool warned its shareholders about those risks.

51.     In its 2022 Annual Report, PowerSchool admits that it "may be subject to legal liability for our online services." It lists as "risk factors," in relevant part: (1)  the impact of potential information technology or data security breaches  or other cyber-attacks; (2) the fact that its activities are and will continue to be subject to extensive government regulation; (3) its ability to comply with HIPAA and other privacy laws and regulations; (4) risk relating to non-compliance with anti-corruption, anti-bribery, and similar laws; (5)  risks related to future litigation; (6)  changes in privacy laws and regulations applicable to its business; and (7) its ability to comply with legal requirements, contractual obligations and industry standards relating to security, data protection and privacy.

52.     Therefore, PowerSchool was aware of the risks its data practices pose.  It was also aware that a cyberattack was foreseeable, and that its practices may not comply with applicable laws.

## E.     The Value of PII

53.     Stolen PII of individuals remains of high value to criminals. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200. According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of

$100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120.

54.     Therefore, the information compromised in this Data Breach is significantly more valuable than the loss of credit card information in a retailer data breach, for example.  The reason being is that victims in those cases can cancel or close credit and debit card accounts.

55.     Martin Walter, senior director at the cybersecurity firm RedSeal, explained why the type data exfiltrated in the Data Breach is much more valuable: "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."

56.     Using the type of PII exfiltrated in the Data Breach, identity thieves are able to commit plenary frauds, including obtaining driver's licenses, government benefits, medical services, and housing or even give false information to police.

57.     Further, fraudulent activity stemming from the Data Breach may not come to light for years.

58.     There is also a strong legitimate market for the type of PII at issue here. Marketing firms utilize personal information to target potential customers, and an entire economy exists related to the value of personal data that can now be monetized by those who exfiltrated PowerSchool's data.

59.     Moreover, there can be a time lag between when harm occurs and when it is discovered, and also between when PII is stolen and when it is used. After conducting a study of data breaches, the U.S. Government Accountability Office ("GAO") stated:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

60.     As a result, it is therefore clear that future monitoring of financial and personal records is reasonable and necessary.

**F.      PowerSchool Failed to Comply with FTC Guidelines for Safeguarding Plaintiffs' and Class Members' Private Information.**

61.     PowerSchool could, and should, have prevented this Data Breach by properly safeguarding the PII.  Proper safeguarding requires testing, monitoring, auditing, securing and encrypting the systems containing the Private Information of Plaintiffs and Class Members.

62.     PowerSchool's clear negligence in not safeguarding the PII of Plaintiffs and Class Members is further elucidated by the repeated warnings and alerts directed to companies like PowerSchool to protect and secure sensitive data they maintain.

63.     Despite the prevalence of public announcements of data breach and data security compromises, PowerSchool failed to take appropriate steps to safeguard the PII of Plaintiffs and Class Members to protect it from being compromised.

64.     The Federal Trade Commission ("FTC") states identity theft is "a fraud committed or attempted using the identifying information of another person without authority." The FTC defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

65.     The negative consequences for Plaintiffs and Class Members as a result of PowerSchool's failure to properly protect and safeguard the PII of the Plaintiffs and Class

Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for many years.

66.     The FTC has issued numerous guidance for businesses which highlight the importance of implementing reasonable data security practices and stress the need for factoring data security into all business decision making.

67.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

68.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

69.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

70.     PowerSchool failed to properly implement these basic data security practices, and PowerSchool's failure to employ reasonable and appropriate measures to protect

against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

71.     The occurrence of the Data Breach indicates that PowerSchool failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exfiltration and exposure of the PII of Plaintiffs and Class Members.

72.     Because PowerSchool failed to properly protect and safeguard Plaintiffs' and Class Members' Private Information, an unauthorized criminal third party was able to access PowerSchool' network, database, and system configuration files and exfiltrate that data.

**G.     PowerSchool Failed to Comply with Industry Standards for Data Security**

73.     PowerSchool was, or reasonably should have been, aware of the importance of safeguarding PII in light of the numerous high-profile data breaches targeting companies such as Target, Neiman Marcus, eBay, Anthem, Deloitte, Equifax, Marriott, T-Mobile, Capital One, school districts, and EdTech companies.

74.     Security standards commonly accepted and implemented by businesses that store and follow industry standards to secure PII using the internet include, without limitation:

   a.     Maintaining a secure firewall configuration;

   b.     Monitoring for suspicious or irregular traffic to servers;

   c.     Monitoring for suspicious credentials used to access servers;

   d.     Monitoring for suspicious or irregular activity by known users;

   e.     Monitoring for suspicious or unknown users;

   f.     Monitoring for suspicious or irregular server requests;

   g.     Monitoring for server requests for PII;

   h.     Monitoring for server requests from VPNs; and

i.      Monitoring for server requests from Tor exit nodes.

75.    The FTC publishes guides for businesses for cybersecurity and protection of PII

which includes basic security standards applicable to all types of businesses.

76.    The FTC recommends that businesses:

a.      Identify all connections to the computers where you store sensitive

information.

b.      Assess the vulnerability of each connection to commonly known or

reasonably foreseeable attacks.

c.      Do not store sensitive consumer data on any computer with an internet

connection unless it is essential for conducting their business.

d.      Scan computers on their network to identify and profile the operating

system and open network services. If services are not needed, they should be

disabled to prevent hacks or other potential security problems. For example, if

email service or an internet connection is not necessary on a certain computer, a

business should consider closing the ports to those services on that computer to

prevent unauthorized access to that machine.

e.      Pay particular attention to the security of their web applications—the

software used to give information to visitors to their websites and to retrieve

information from them. Web applications may be particularly vulnerable to a

variety of hacker attacks.

f.      Use a firewall to protect their computers from hacker attacks while it is

connected to a network, especially the internet.

g.    Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h.    Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i.    Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

77.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

78.     Because PowerSchool collects and maintains PII, it has a duty to keep the PII secure.  Plaintiffs and Class Members can reasonably expect that when their PII is provided to a sophisticated business for a specific purpose, that business will safeguard their PII and use it only for that purpose.

79.     Nonetheless, PowerSchool inexplicably failed to implement appropriate measures to prevent the Data Breach. It is reasonable to conclude that if PowerSchool properly maintained and adequately protected its systems, it could have prevented the Data Breach.

80.     There are other best cybersecurity practices that are standard for preventing data breaches which include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

81.     It is reasonable to conclude the Data Breach was the result of PowerSchool failing to comply with one or more of the accepted industry standards, thereby opening the door to and causing the Data Breach.

**H.     PowerSchool's Negligent Acts and Breaches**

82.     PowerSchool participated in and controlled the process of gathering the Private Information from Plaintiffs and Class Members.

83.     As a result, PowerSchool therefore assumed and otherwise owed duties and obligations to Plaintiffs and Class Members to take reasonable measures to protect and safeguard their Private Information.  These reasonable measures include the duty of oversight, training, instruction, and testing of the data security policies and network systems. PowerSchool breached

18

these obligations to Plaintiffs and Class Members and/or were otherwise negligent because they failed to properly implement data security systems and policies for their network that would have adequately safeguarded Plaintiffs' and Class Members' Private Information. It is reasonable to conclude that PowerSchool's unlawful conduct included, but is not limited to, one or more of the following acts and/or omissions:

      a.      Failing to design and maintain an adequate data security system to reduce the risk of data breaches and protect Plaintiffs' and Class Members' Private Information;

      b.      Failing to properly monitor their data security systems for data security vulnerabilities and risk;

      c.      Failing to audit, test and assess the adequacy of their data security system;

      d.      Failing to develop adequate training programs related to the proper handling of emails and email security practices;

      e.      Failing to put into develop and place uniform procedures and data security protections for its network;

      f.      Failing to adequately fund and allocate resources for the adequate design, operation, maintenance, and updating necessary to meet industry standards for data security protection;

      g.      Failing to ensure or otherwise require that they were compliant with FTC guidelines for cybersecurity;

      h.      Failing to ensure or otherwise require that they were adhering to one or more of industry standards for cybersecurity discussed above;

i.      Failing to implement or update antivirus and malware protection software in need of security updating;

j.      Failing to require encryption or adequate encryption on its data systems; and,

k.      Otherwise negligently and unlawfully failing to safeguard Plaintiffs' and Class Members' Private Information provided to Defendants, which in turn allowed cyberthieves to access their IT systems.

### V. COMMON INJURIES AND DAMAGES

84.     Due to PowerSchool's ineffective and inadequate data security practices, Plaintiffs and Class Members have suffered theft of their Private Information by criminals who now have full access to, and ability to use, the data as they wish for nefarious purposes. Further, Plaintiffs and Class Members face a present and ongoing risk of fraud and identity theft by those who hold their Private Information and can sell and/or use the information for any purpose.

85.     Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iv) "out-of-pocket" costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) diminution of value of their Private Information; and (viii) the continued risk to their Private Information, which remains in PowerSchool's control, and which is subject to further breaches,

so long as PowerSchool fails to undertake appropriate and adequate measures to safeguard and protect Plaintiffs' and Class Members' Private Information.

**A.    The Risk of Identity Theft to Plaintiffs and Class Members is Present and Ongoing**

86.    The link between a data breach and the risk of identity theft is well established. Criminals steal or otherwise acquire Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then use the information to commit a variety of identity theft related crimes identified below.

87.    A person's identity is akin to a puzzle with multiple data points, and, therefore, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity.  A thief can also track the victim to attempt other hacking crimes against the individual to obtain more data to perfect more crimes.

88.    For example, a data thief armed with just a name and date of birth can utilize a hacking technique known as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches such as the one in the case at bar are often the starting point for these additional targeted attacks on the victims.

89.    The dark web is an unindexed layer of the internet that requires special software or authorization to access which criminals prefer as it offers anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address

of the website they wish to visit in advance. This prevents dark web marketplaces from being

easily monitored by authorities or accessed by those not in the know.

90.    A sophisticated black market exists on the dark web where criminals can buy or

sell contraband and frequently personal information like the PII at issue here. The digital

character of PII stolen in data breaches lends itself to dark web transactions because it is

immediately transmissible over the internet and the buyer and seller can retain their anonymity.

Criminals can readily purchase usernames and passwords for online streaming services, stolen

financial information and account login credentials, and Social Security numbers, dates of birth,

and medical information. As Microsoft warns "[t]he anonymity of the dark web lends itself well

to those who would seek to do financial harm to others."

91.    The Social Security Administration stresses that the loss of an individual's Social

Security number, as is the case here, can lead to identity theft and extensive, long lasting, and

damaging financial fraud:

> Scammers use your Social Security number to get other personal
> information about you. They can use your SSN and your good credit to
> apply for more credit in your name. Then, when they use the credit
> cards and don't pay the bills, it damages your credit. You may not find
> out that someone is using your SSN until you're turned down for credit,
> or you begin to get calls from unknown creditors demanding payment
> for items you never bought.

92.    Even if a victim obtains a new Social Security number, the fraud might continue,

as "[t]he credit bureaus and banks are able to link the new number very quickly to the old

number, so all of that old bad information is quickly inherited into the new Social Security

number."

93.    Identity thieves can also use Social Security numbers to obtain a driver's license

or official identification card in the victim's name but with the thief's picture; use the victim's

name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

94.     Further, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.

95.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

96.     Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."  Nonetheless, PowerSchool failed to timely report to Plaintiffs and Class Members that their Private Information had been stolen.

97.     In addition to financial losses, victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online.

98.     Identity theft victims often must pay out-of-pocket expenses that can exceed thousands of dollars.  Victims also suffer the emotional toll identity theft can take, and some victims are forced to spend considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

99.     In addition, data thieves may wait years before attempting to use the stolen PII, further complicating victim's effort to resolve the identity theft. To protect themselves, Plaintiffs and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

100.    The FTC has further recognized that consumer data is a new and valuable form of currency. Former Commissioner Pamela Jones Harbour has stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."

101.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices, including the need to factor data security into all business decision-making.

**B.     Loss of Time to Mitigate the Risk of Identify Theft and Fraud**

102.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

103.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of actions in an attempt to mitigate losses as a result of the Data Breach. These actions include placing "freezes" and "alerts" with credit reporting agencies, contacting

financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports.

104.    The U.S. Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

105.    The FTC also recommends consistent actions that data breach victims should take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

**C.    Diminution of Value of the Private Information**

106.    PII is a valuable property right that has considerable market value.

107.    The high value of PII is demonstrated by the active and robust legitimate marketplace for Private Information that exists. In 2019, the data brokering industry was estimated to be worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers. Further, consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.

108.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been

damaged and diminished in its value by its unauthorized and potential release onto the Dark Web, where it holds significant value for the threat actors.

**D.    Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary**

109.    To date, PowerSchool has failed to provide Plaintiffs and Class Members with relief for the damages they have suffered as a result of the Data Breach despite Plaintiffs and Class Members being at present and future risk of identity theft and fraud.

110.    Given the type of targeted attack in this case resulting from sophisticated criminal activity, the type of Private Information (e.g., Social Security numbers), and the modus operandi of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes.  These crimes include opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

111.    It must be noted there may be a substantial time lag measured in years between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. A study of data breaches by U.S. Government Accountability Office describes this time lag:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

112.    Such fraud may go undetected until debt collection calls commence months, or even years, later. Further, an individual may not be aware that their Social Security number was

used to file for unemployment benefits until law enforcement informs the individual's employer of the suspected fraud. In addition, fraudulent tax returns are only routinely discovered when an individual's authentic tax return is rejected.

113.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.  The type of information exposed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

114.    Consequently, Plaintiffs and Class Members are at a present, ongoing, and future risk of fraud, identity theft, and financial losses for their entire lives.

115.    The retail cost of credit monitoring and identity theft monitoring is approximately $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the ongoing risk of identity theft that resulted from PowerSchool's Data Breach, a risk that will remain long after the 24 months of monitoring offered by PowerSchool expires. This is a recurring future cost that Plaintiffs and Class Members would not need to bear but for PowerSchool's failure to protect and safeguard their Private Information.

## VI. CLASS ALLEGATIONS

116.    Plaintiffs bring this nationwide class action under Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated.

117.    Plaintiffs seek to represent a nationwide class defined as follows:

All persons whose Private Information was accessed or acquired during the Data Breach at PowerSchool and its affiliated entities, which

occurred on or about December 2024.

118.    Excluded from the Class are the following individuals and/or entities: Defendant and its subsidiaries, parents, predecessors, successors and assigns, including any entity in which any of them have a controlling interest and its officers, directors, employees, affiliates, or legal representatives; persons who properly and timely request exclusion from the Class; Plaintiffs' counsel, Class counsel, and Defendant's counsel; the Judge(s) assigned to this case; and the legal representatives, successors, and assigns of any such excluded person.

119.    Plaintiffs reserve the right to modify, change, or expand the Class definition based on discovery and further investigation.

120.    Ascertainability: Class membership is defined based on objective criteria, and individual members will be readily identifiable using PowerSchool's records.

121.    Numerosity, Fed. R. Civ. P. 23(a)(1): Class Members are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of PowerSchool and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, there are millions of individuals whose Private Information may have been improperly accessed in the Data Breach, and the Class is readily identifiable within PowerSchool's records.

122.    Commonality and Predominance of Common Questions of Fact and Law, Fed. R. Civ.P. 23(a)(2) and (b)(3): PowerSchool engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was maintained and unlawfully accessed in the same way. Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class

members. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. These common legal and factual questions include, but are not limited to:

a.    Whether and to what extent PowerSchool had a duty to protect the Private Information of Plaintiffs and Class Members;

b.    Whether PowerSchool had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c.    Whether PowerSchool had duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d.    Whether PowerSchool failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e.    Whether and when PowerSchool actually learned of the Data Breach;

f.    Whether PowerSchool adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g.    Whether PowerSchool failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.    Whether PowerSchool adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

i.    Whether PowerSchool engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

j.      Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of PowerSchool's wrongful conduct;

k.      Whether Plaintiffs and Class Members are entitled to restitution as a result of PowerSchool's wrongful conduct; and,

l.      Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

123.    Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of the claims of the other Class Members, because Plaintiffs all had their Private Information compromised as a result of the Data Breach, due to PowerSchool's misfeasance. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

124.    Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Classes they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

125.    Superiority, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit

the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like PowerSchool. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

126.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because PowerSchool would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

127.    The litigation of the claims brought herein is manageable. PowerSchool's uniform conduct, including their privacy policy, uniform methods of data collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

128.    Adequate notice can be given to Class Members directly using information maintained in PowerSchool's records.

129.    Unless a class-wide injunction is issued, PowerSchool may continue in their failure to properly secure the Private Information of Class Members, PowerSchool may continue

to refuse to provide proper notification to Class Members regarding the Data Breach, and PowerSchool may continue to act unlawfully as set forth in this Complaint.

130.    Further, PowerSchool has acted or refused to act on grounds generally applicable to the Class and, accordingly, class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

131.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.      Whether PowerSchool owed a legal duty to Plaintiffs and Class Members to exercise due care in obtaining, storing, collecting, maintaining, using, and/or safeguarding their Private Information;

b.      Whether PowerSchool breached a legal duty to Plaintiffs and Class Members to exercise due care in obtaining, storing, collecting, maintaining, using, and/or safeguarding their Private Information;

c.      Whether PowerSchool failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d.      Whether PowerSchool adequately and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

e.      Whether PowerSchool failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

f.      Whether hackers obtained Class Members' Private Information via the

Data Breach;

g.      Whether Class Members are entitled to actual, consequential, and/or

nominal damages, and/or injunctive relief as a result of PowerSchool's wrongful

conduct.

## VII. CAUSES OF ACTION

## <u>COUNT I - NEGLIGENCE</u>

132.    Plaintiffs and Class Members repeat and re-allege each and every allegation as if

fully set forth herein.

133.    PowerSchool knowingly collected, acquired, stored, and/or maintained Plaintiffs'

and Class Members' Private Information, and shared and used it for commercial gain, and had a

duty to exercise reasonable care in safeguarding, securing, and protecting the Private Information

from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

134.    The duty included obligations to take reasonable steps to prevent disclosure of the

Private Information, and to safeguard the information from theft. PowerSchool's duties included

the responsibility to design, implement, and monitor data security systems, policies, and

processes to protect against reasonably foreseeable data breaches such as this Data Breach.

135.    PowerSchool owed a duty of care to Plaintiffs and Class Members to provide data

security consistent with industry standards and other requirements discussed herein, and to

ensure that their systems and networks, policies, and procedures, and the personnel responsible

for them, adequately protected the Private Information.

136.    PowerSchool owed a duty of care to safeguard the Private Information due to the

foreseeable risk of a data breach and the severe consequences that would result from its failure to so safeguard the Private Information.

137.    PowerSchool's duty of care to use reasonable security measures arose as a result of the special relationship that existed between PowerSchool and Plaintiffs and Class Members, which is recognized by laws and regulations including, but not limited to, the FTC Act, HIPAA, as well as common law. PowerSchool was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

138.    In addition, PowerSchool had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

139.    PowerSchool's duty to use reasonable care in protecting Private Information arose not only as a result of the statutes and regulations described above, but also because PowerSchool is bound by industry standards to protect Private Information that it either acquires, maintains, or stores.

140.    PowerSchool breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information, as alleged and discussed above.

141.    It was foreseeable that PowerSchool's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

142.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

143.    The imposition of a duty of care on PowerSchool to safeguard the Private Information they maintained is appropriate because any social utility of PowerSchool's conduct is outweighed by the injuries suffered by Plaintiffs and Class Members as a result of the Data Breach.

144.    As a direct and proximate result of PowerSchool's negligence, Plaintiffs and Class Members are at a current and ongoing risk of identity theft, and Plaintiffs and Class Members sustained compensatory damages including: (i) invasion of privacy; (ii) financial "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iv) financial "out-of-pocket" costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) diminution of value of their Private Information; (viii) future costs of identity theft monitoring; (ix) anxiety, annoyance and nuisance; and (x) the continued risk to their Private Information, which remains in PowerSchool's control, and which is subject to further breaches, so long as PowerSchool fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

145.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

146.    PowerSchool's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class Members in an unsafe and unsecure manner.

147.    Plaintiffs and Class Members are also entitled to injunctive relief requiring PowerSchool to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II - NEGLIGENCE *PER SE*

148.    Plaintiffs and Class Members repeat and re-allege each and every allegation as if fully set forth herein.

149.    Pursuant to Federal Trade Commission, 15 U.S.C. § 45, PowerSchool had a duty to provide fair and adequate data security practices to safeguard Plaintiffs' and Class Members' Private Information.

150.    PowerSchool breached its duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate data security practices to safeguard Plaintiffs' and Class Members' Private Information.

151.    PowerSchool's failure to comply with applicable laws and regulations constitutes negligence per se.

152.    But for PowerSchool's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

153.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of PowerSchool's breach of its duties. PowerSchool knew or should have known that it was failing to meet its duties, and that PowerSchool's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

154.    As a direct and proximate result of PowerSchool's negligence, Plaintiffs and Class

Members are at a current and ongoing risk of identity theft, and Plaintiffs and Class Members

sustained compensatory damages including: (i) invasion of privacy; (ii) financial "out-of-pocket"

costs incurred mitigating the materialized risk and imminent threat of identity theft; (iii) loss of

time and loss of productivity incurred mitigating the materialized risk and imminent threat of

identity theft risk; (iv) financial "out-of-pocket" costs incurred due to actual identity theft; (v)

loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and

targeted marketing emails; (vii) diminution of value of their Private Information; (viii) future

costs of identity theft monitoring; (ix) anxiety, annoyance and nuisance; and (x) the continued

risk to their Private Information, which remains in PowerSchool's control, and which is subject

to further breaches, so long as PowerSchool's fail to undertake appropriate and adequate

measures to protect Plaintiffs' and Class Members' Private Information.

155.    Plaintiffs and Class Members are entitled to compensatory, consequential, and

nominal damages suffered as a result of the Data Breach.

156.    Plaintiffs and Class Members are also entitled to injunctive relief requiring

PowerSchool to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii)

submit to future annual audits of those systems and monitoring procedures; and (iii) immediately

provide adequate credit monitoring to all Class Members.

## COUNT III-VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONN. GEN. STAT. § 42-110a, *et seq.*

157.    Plaintiffs and Class Members repeat and re-allege each and every allegation as if

fully set forth herein.

158.    The Connecticut Unfair Trade Practices Act (CUTPA), CONN. GEN. STAT. § 42-110b(a) declares that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

159.    PowerSchool is a "person" within the meaning of CONN. GEN. STAT. § 42-110a(1) that engaged in "trade" and/or "commerce" as defined by CONN. GEN. STAT. § 42-110a(4) within the state of Connecticut.

160.    CONN. GEN. STAT. § 42-110g(b) authorizes any person suffering ascertainable loss of money or property, real or personal, as a result of a CUPTA violation to bring a class action.

161.    Plaintiffs are "persons" within the meaning of CONN. GEN. STAT. § 42-110a(1).

162.    PowerSchool's deceptive and/or unfair conduct in the conduct of trade and/or commerce within Connecticut in the form of improperly failing to secure and safeguard the PII of Plaintiffs and Class Members has caused them to suffer ascertainable harm in the form of stolen PII.

163.    PowerSchool's deceptive and/or unfair conduct has caused the Plaintiffs and Class Members damages in the form of (i) invasion of privacy; (ii) financial "out-of-pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (iv) financial "out-of-pocket" costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) diminution of value of their Private Information; (viii) future costs of identity theft monitoring; (ix) anxiety, annoyance and nuisance; and (x) the continued risk to their Private Information, which remains in PowerSchool's control, and which is subject to

further breaches, so long as PowerSchool fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

164.    Because PowerSchool knew or should have known that its conduct was deceptive and/or unfair under CONN. GEN. STAT. § 42-110b(a), its conduct was willful and/or was undertaken with reckless disregard for the harm it would cause Plaintiffs and Class Members.

165.    Defendant PowerSchool's deceptive and unfair acts described above directly and proximately caused Plaintiffs and Class Members to suffer actual damages, attorneys' fees, and costs.

166.    Accordingly, Plaintiffs, individually and on behalf of all Class Members, seek (a) a declaration that Defendant PowerSchool's conduct described above violates the Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a, *et seq.;* (b) an award of actual damages; (c) an award of attorneys' fees and costs pursuant to CONN. GEN. STAT. § 42-110g(d); and, (d) any further relief the Court deems just and proper.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of Class Members, request that the Court enter judgment in their favor and against PowerSchool, as follows:

A.    Certify the proposed Class;

B.    Appoint Plaintiffs and their counsel to represent the Class;

C.    Enter Judgment against PowerSchool on Plaintiffs' and Class Members' asserted causes of action;

D.    Award Plaintiffs and Class Members appropriate relief, including actual and statutory damages, restitution, disgorgement, and punitive damages;

E.    Award equitable, injunctive, and declaratory relief as may be appropriate;

F.      Award all costs, including experts' fees and attorneys' fees, as well as the costs of prosecuting this action;

G.      Award pre-judgment and post-judgment interest as prescribed by law; and

H.      Grant additional legal and equitable relief as this Court may find just and proper; and,

I.      Award such other and further relief as this Court may deem just and proper.


## VIII. DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury on all issues so triable.


Dated:  April 28, 2025                              Respectfully submitted,

                                                    SILVER GOLUB & TEITELL LLP

                                                    */s/ Ian W. Sloss*
                                                    Ian W. Sloss (ct31244)
                                                    SILVER GOLUB & TEITELL LLP
                                                    ONE LANDMARK SQUARE, FLOOR 15
                                                    STAMFORD, CONNECTICUT 06901
                                                    Tel. (203) 325-4491
                                                    isloss@sgtlaw.com